IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Chad G.,[1] | ) | C/A No.: 1:21-1645-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Kilolo Kijakazi,[2] Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable David C. Norton, United States District Judge, dated June 7, 2021, referring this matter for disposition. [ECF No. 5]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 4].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Fed. R. Civ. P. 25(d), she is substituted for former Commissioner Andrew Saul as the defendant in this action.

Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

## I.     Relevant Background

### A.     Procedural History

On April 6, 2020, Plaintiff filed an application for DIB in which he alleged his disability began on September 23, 2018. Tr. at 57, 157–60. His application was denied initially and upon reconsideration. Tr. at 78–81, 83–86. On January 11, 2021, Plaintiff had a telephonic hearing before Administrative Law Judge ("ALJ") Ronald Sweeda. Tr. at 29–44 (Hr'g Tr.). The ALJ issued an unfavorable decision on January 28, 2021, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 12–28. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on June 3, 2021. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 34 years old at the time of the hearing. Tr. at 34. He completed four years of college. Tr. at 183. His past relevant work ("PRW") was as a law enforcement officer. Tr. at 35. He alleges he has been unable to work since September 23, 2018. Tr. at 34.

2.    Medical History

Plaintiff presented to psychiatrist Douglas Southworth, M.D. ("Dr. Southworth"), for an outpatient visit on July 17, 2018. Tr. at 732. He reported his divorce was "taking a turn for the worse." *Id.* He said he remained in good standing at work, but described some administrative problems affecting the whole department. Tr. at 733. He indicated he viewed his current job as a potential steppingstone to a position he aspired to obtain, and Dr. Southworth noted "his ambition seem[ed] realistic enough." *Id.* Dr. Southworth recorded normal findings on mental status exam, except for angry mood due to disappointment over complications with the divorce process. Tr. at 734. He noted that despite diagnoses of PTSD and developmental reading disorder, Plaintiff had managed to function competently in law enforcement. Tr. at 734–35. He stated he had "no concerns about [Plaintiff's] ability to fulfill the requirements of his work." Tr. at 735. Plaintiff indicated he anticipated possible use of sick time to deal with

3

aspects of his divorce, and Dr. Southworth expressed his support. *Id.* Dr. Southworth continued Plaintiff's prescriptions for Adderall and Trazodone. *Id.*

On September 24, 2018, Plaintiff presented to licensed professional counselor Joseph E. Scanlon ("Counselor Scanlon") for an assessment. Tr. at 492. He reported acute anxiety following a shootout with a suspect the prior year. *Id.* He described a history of service in the Marine Corp, during which he engaged in combat actions. *Id.* He indicated he had been diagnosed with posttraumatic stress disorder ("PTSD") and psychogenic chronic vomiting syndrome. *Id.* Counselor Scanlon noted Plaintiff had been exposed to a traumatic event and persistently re-experienced the traumatic event. *Id.*

On September 25, 2018, Plaintiff reported his relationship with his estranged wife was "beyond bad," such that he planned to file for divorce the following week. Tr. at 715. He reported feeling stressed and angry. *Id.* He said his supervisors claimed to have no knowledge of his PTSD diagnosis, although he claimed he disclosed it to them. *Id.* He expected his supervisors would terminate his employment. *Id.* Dr. Southworth observed normal findings on mental status exam, but noted Plaintiff was angry about his divorce and relieved about leaving his job. Tr. at 717. He acknowledged Plaintiff had a 70% disability rating for PTSD and a diagnosis of developmental reading disorder, but had "manage[d] to function competently

4

in law enforcement." *Id.* He stated Plaintiff's "marital separation and the stresses of his job ha[d] conspired to make him too overwhelmed to function well at work." *Id.* He indicated he completed Family and Medical Leave Act ("FMLA") paperwork for temporary leave, but noted Plaintiff was "probably realistic when he notes that 'I'm done' with law enforcement work." *Id.* Plaintiff asked that Dr. Southworth describe him as "unable to fulfill the duties of the job," and Dr. Southworth noted Plaintiff had been in good standing until very recently when he was involved in "an especially difficult high-profile case." *Id.* He continued Adderall and Trazodone as needed. Tr. at 718.

On November 20, 2018, Plaintiff described his sleep as going to bed with his girlfriend between 6:00 and 7:00 PM, remaining awake in bed until 11:00 PM to 12:00 AM, and waking around 3:30 AM, either spontaneously or due to combat-related nightmares. Tr. at 708. He indicated he would remain awake watching his girlfriend, a local television reporter, on the morning news and texting her. *Id.* Although he endorsed sleeping only from midnight to 3:30 AM, he indicated this was an improvement. *Id.* Dr. Southworth described Plaintiff's mood as angry about his divorce, but relieved about leaving his job. Tr. at 710. He otherwise noted normal findings on mental status exam. *Id.* Plaintiff indicated he had been referred to Counselor Scanlon for therapy and was engaging well with him. *Id.* He reported Dr.

Lamm had started him on Fluoxetine 20 mg. *Id.* He noted he was tolerating the medication well and his girlfriend had noticed improvement. *Id.* Dr. Southworth indicated he would take over prescribing Fluoxetine and continue Adderall. Tr. at 711. He ordered melatonin and recommended Plaintiff continue psychotherapy with Counselor Scanlon. *Id.*

Plaintiff reported inattention, avoidance, and irritability on February 4, 2019. Tr. at 695–96. He denied depression, hyper arousal, hyper startle, and sleep issues, aside from occasional nightmares. *Id.* He denied suicidal and homicidal ideation, but endorsed a history of "dark thoughts." Tr. at 696. He reported his energy level was okay. *Id.* Psychiatrist Floyd Sallee, M.D. ("Dr. Sallee") noted mostly normal findings on mental status exam, except that Plaintiff was inattentive, had poor concentration and focus, and demonstrated only fair insight and judgment. Tr. at 698. He indicated Plaintiff was not a danger to himself or others and planned to continue his current treatment regimen, which included therapy with Counselor Scanlon and medication management with melatonin 3 mg at bedtime, Fluoxetine 20 mg daily, and Adderall 30 mg twice daily. Tr. at 698–99.

On February 6, 2019, Plaintiff complained that Fluoxetine was not helping. Tr. at 677. He endorsed orgasmic dysfunction upon questioning as to sexual side effects, but decline Dr. Southworth's offer to prescribe Bupropion to address the problem. Tr. at 692. Dr. Southworth observed Plaintiff to have

good grooming and hygiene, but slightly disheveled appearance, as he was growing a beard. Tr. at 694. He recorded normal findings on mental status exam, noting Plaintiff "express[ed] anger in a well-modulated way." *Id.* He indicated Plaintiff intended to discontinue Fluoxetine and would continue weekly psychotherapy with Counselor Scanlon and mental health treatment with Dr. Sallee. Tr. at 695.

On February 14, 2019, Plaintiff presented to Carolina Forest Family Medical. Tr. at 237. He reported chronic nausea. *Id.* He admitted he was receiving psychiatric treatment through the Department of Veterans Affairs ("VA") and had stopped taking Prozac one week prior. *Id.* The provider assessed cyclic vomiting syndrome, PTSD, and bulimia. *Id.* He prescribed Nexium and Zofran and referred Plaintiff to a specialist. *Id.*

Plaintiff presented to gastroenterologist Timothy J. Cornnell, M.D. ("Dr. Cornnell"), for an initial evaluation of vomiting on March 13, 2019. Tr. at 271. He reported emesis as a small amount of bilious material and indicated he experienced episodes a few times a week that were preceded by nausea. *Id.* He indicated his symptoms had lasted for more than 15 years with the same severity. *Id.* Dr. Cornnell recorded no abnormalities on physical exam. Tr. at 272–73. He indicated he did not fully agree with the diagnosis of bulimia, as Plaintiff had proclivity to vomit since childhood. Tr.

at 273. He planned to proceed with esophagogastroduodenoscopy ("EGD") and gastric emptying studies. *Id.*

On March 26, 2019, an EGD showed a normal esophagus and duodenum and a single non-bleeding ulcer in the distal stomach body. Tr. at 267–69. A biopsy was negative. Tr. at 259.

A gastric emptying study was normal on April 25, 2019. Tr. at 258.

On May 6, 2019, Plaintiff participated in a telehealth visit with Dr. Sallee. Tr. at 439–44. He indicated he had been coaching his son's baseball team. Tr. at 440. He denied suicidal and homicidal ideation, depression, hyper arousal, hyper startle, and sleep issues, but endorsed irritability, avoidance, occasional nightmares, and a history of "dark thoughts." *Id.* He reported "okay" energy and indicated he was participating in weekly therapy with Counselor Scanlon. *Id.* Dr. Sallee noted mostly normal findings on mental status exam, except for poor concentration, inattentiveness, and fair insight and judgment. Tr. at 442. He continued Adderall 30 mg twice a day and instructed Plaintiff to return in three months. Tr. at 443.

Plaintiff also presented to his primary care provider, Abdias J. De La Rosa Serrano, M.D. ("Dr. De La Rosa Serrano"), for his annual exam on May 6, 2019. Tr. at 445. He reported trying to eat as healthy as possible and lifting weights and running seven miles daily. *Id.* Dr. De La Rosa Serrano recorded normal findings on physical exam. Tr. at 448–49. He ordered lab

studies and recommended a low salt diet and blood pressure monitoring for hypertension. Tr. at 449.

Plaintiff attended a 45-minute psychotherapy session with Counselor Scanlon on May 7, 2019. Tr. at 584. Counselor Scanlon noted he continued challenging Plaintiff's ideas that supported avoidance of conflict and reinforced the distinction between assertiveness and aggression. *Id.*

During a 45-minute psychotherapy session on May 14, 2019, Counselor Scanlon worked with Plaintiff on correcting irrational thinking that led to depression. Tr. at 584. He noted Plaintiff was exposed to irrational beliefs and conclusions that contributed to his anxiety and explored techniques to decrease cognitive errors and distortion. *Id.*

On May 21, 2019, Plaintiff and Counselor Scanlon worked on identifying situations, thoughts, and feelings that triggered anxiety and anxious verbal or behavioral actions, as well as the targets of those actions. Tr. at 584. Counselor Scanlon helped Plaintiff assess the stimuli that had triggered his anxiety and examined the thoughts, feelings, and actions that had characterized his past behavior to develop healthier choices. *Id.*

On May 24, 2019, Katherine Smith, D.O., who was covering for Dr. Sallee, notified Plaintiff she was unable to refill his prescription for Adderall because his urine drug screen had been positive for cannabinoids. Tr. at 646.

Plaintiff underwent an EGD on May 28, 2019. Tr. at 249–51. It showed a normal esophagus, stomach, and duodenum. Tr. at 251.

That same day, Counselor Scanlon worked with Plaintiff on improving self-confidence, being more assertive with family, and controlling mood, affect, and behavior. Tr. at 584.

Plaintiff returned to Counselor Scanlon on May 30, 2019, and they worked on identifying situations, thoughts, and feelings that triggered his anxiety and anxious verbal and behavioral actions, as well as the targets of those actions. Tr. at 584. Counselor Scanlon helped Plaintiff assess the stimuli that triggered his anxiety and examined the thoughts, feelings, and actions underlying his past behavior to develop healthier choices. *Id.*

Plaintiff followed up with Dr. Cornnell on June 4, 2019. Tr. at 246. He described chronic vomiting that occurred at will. *Id.* Dr. Cornnell recorded normal findings on physical exam. Tr. at 247–48. He noted Plaintiff had intact emptying function and no obstructive lesions or mucosal breach. Tr. at 248. He indicated he would focus his attention on the pancreatico-biliary axis. *Id.* He noted studies may be entirely normal and had "[s]trong suspicion for psychiatric imbalance." *Id.* He advised dietary management and ordered a limited right upper abdominal quadrant ultrasound. *Id.*

On June 6, 2019, Counselor Scanlon described his treatment approach as a problem/symptom focused approach utilizing cognitive and behavioral

10

techniques and interventions for problem resolution and therapeutic stabilization. Tr. at 585. He noted Plaintiff had significant difficulty demonstrating insight into his treatment issues as they applied to control of mood, affect, and behavior, despite being engaged in the therapeutic process to the best of his ability. *Id.* He indicated Plaintiff was pessimistic about the possibility of improvement. *Id.* He stated Plaintiff's condition was stable, although he was having difficulty maintaining stability. *Id.*

Plaintiff worked with Counselor Scanlon on identifying anxiety triggers and developing healthier choices to confront situations on June 13, 2019. Tr. at 585.

On June 19, 2019, Counselor Scanlon assisted Plaintiff in improving awareness of his personal physiology, deep breathing to reduce stress, and assertive self-protective behavior. Tr. at 585.

Counselor Scanlon helped Plaintiff to identify and address issues that contributed to depression on June 27, 2019. Tr. at 585. He assisted Plaintiff in identifying and addressing anxiety triggers on July 8, 2019. Tr. at 586.

On July 9, 2019, an abdominal ultrasound was normal. Tr. at 243.

Counselor Scanlon explored depressive feelings and helped Plaintiff identify the sources of his depression on July 17, 2019. Tr. at 586.

On August 7, 2019, hepatic imaging showed low gallbladder ejection fraction that might represent biliary dyskinesia. Tr. at 242.

On August 8, 2019, board-certified psychiatrist Cheryn Grant, D.O. ("Dr. Grant"), prepared a memorandum after being asked by Plaintiff's long-term disability insurer to review the case from a psychiatric point of view. Tr. at 595–99. She acknowledged Plaintiff had been described as having PTSD, attention deficit hyperactivity disorder ("ADHD"), and developmental reading disorder, but had performed his work-related tasks with no difficulty for several years despite these diagnoses. Tr. at 598. She felt Plaintiff had no limitations or restrictions associated with any medical conditions, except for adjustment issues with his divorce that lasted from September 25, 2018, until November 20, 2018. Tr. at 598–99. She considered Plaintiff to have no current limitations or restrictions and to be stable in his psychiatric status. Tr. at 599.

Plaintiff presented to licensed clinical psychologist Jonathan A. Simons, Ph.D. ("Dr. Simons"), for a fitness-for-duty evaluation on August 13, 2019. Tr. at 278–81. Dr. Simons observed Plaintiff to present with a moist hand, suggesting anxiety/arousal, to be somewhat reticent upon initial presentation, and to become more comfortable and open as the interview progressed. Tr. at 279. He stated Plaintiff demonstrated general dysphoric mood and his mental status was within normal limits, except for mood-related issues. *Id.* He noted Plaintiff had very serious facial expressions,

showed a mild hand tremor, and smiled only once or twice during the interview. *Id.*

Plaintiff reported his PTSD-related symptoms of anxiety, lack of focus, and anger would likely interfere with his ability to perform essential job duties. Tr. at 280. Dr. Simons agreed Plaintiff's "psychiatric problems prevented and w[ould] continue to prevent him from being able to perform the essential duties of a law enforcement officer." Tr. at 281. He noted Plaintiff's psychiatric symptoms were manageable prior to a raid in 2015, in which he experienced additional trauma. *Id.* He felt the additional trauma exacerbated Plaintiff's illness to a point that treatment was not effective enough to restore him to the level of functioning he enjoyed prior to the 2015 raid. *Id.* He wrote: "With a great deal of professional confidence, my opinion is that he is not fit for duty. I do not think he will regain his ability to function as a law officer in the future, even with appropriate treatment." *Id.*

On August 15, 2019, psychologist David Paris, Ph.D. ("Dr. Paris"), completed a disability benefits questionnaire in conjunction with a compensation and pension ("C&P") examination request. Tr. at 342–51. He indicated Plaintiff had been diagnosed with PTSD. Tr. at 343. He stated Plaintiff had "[t]otal occupational and social impairment." *Id.*

Dr. Paris considered Plaintiff to meet diagnostic criteria for PTSD based on having directly experienced a traumatic event and having

witnessed, in person, traumatic events as they occurred to others. Tr. at 346. He identified Plaintiff's intrusion symptoms as recurrent, involuntary, and intrusive distressing memories of the traumatic events; dissociative reactions (e.g., flashbacks) in which the individual feels or acts as if the traumatic events were recurring; and marked psychological reactions to internal or external cues that symbolize or resemble an aspect of the traumatic events. Tr. at 347. He noted persistent avoidance of stimuli associate with traumatic events, as evidenced by avoidance of or efforts to avoid distressing memories, thoughts, or feelings about or closely associated with the traumatic events and avoidance of or efforts to avoid external reminders (people, places, conversations, activities, objects, situations) that arouse distressing memories, thoughts, or feelings about or closely associated with the traumatic events. *Id.* He indicated Plaintiff had negative alterations in cognitions and mood associated with the traumatic events as evidenced by persistent and exaggerated negative beliefs or expectations about oneself, others, or the world, persistent negative emotional state, and feelings of detachment or estrangement from others. Tr. at 347–48. He found Plaintiff to have marked alterations in arousal and reactivity associated with the traumatic events as evidenced by irritable behavior and angry outbursts (with little or no provocation) typically expressed as verbal or physical aggression toward people or objects, reckless or self-destructive behavior,

14

hypervigilance, and sleep disturbance (e.g., difficulty falling or staying asleep or restless sleep). Tr. at 348.

Dr. Paris indicated the symptoms had lasted greater than one month and caused clinically significant distress or impairment in social, occupational, or other important areas of functioning. Tr. at 348. He stated Plaintiff experienced depressed mood, anxiety, near-continuous panic or depression affecting the ability to function independently, appropriately, and effectively, chronic sleep impairment, disturbances of motivation and mood, difficulty in adapting to stressful circumstances, including work or a work-like setting, impaired impulse control, such as unprovoked irritability with periods of violence, and persistent danger of hurting self or others. Tr. at 349. He described Plaintiff as casually-dressed, articulate, and cooperative with "OK" grooming and "matter of fact" behavior. *Id.* He considered Plaintiff capable of managing his own financial affairs. *Id.*

On August 23, 2019, Bradley Fancher, M.D. ("Dr. Fancher"), prepared a memorandum related to Plaintiff's long-term disability claim. Tr. at 588–90. He indicated he had been asked to review the claim file to ascertain whether Plaintiff was impaired from employment due to a physical condition. Tr. at 588. He wrote:

> None of the medical records we have to review reveal that the claimant has had any difficulty performing his job due to his vomiting disorder. None would be expected, given the relative infrequency of his events (twice a week), as described by Dr.

Cornnell. There is no indication in the medical records that the claimant has suffered from weight loss. Dr. Cornnell feels the claimant has been "cleared" from a GI standpoint. Given the records we have to review, it is highly probable that the claimant's vomiting disorder is of psychogenic origin.

After reviewing the medical records, I cannot identify that the claimant has any physical condition that would preclude him from performing medium level work. I cannot identify that the claimant has any limitation of standing or walking. The medical records do not demonstrate that the claimant has any impairment with regards to lifting fifty or more pounds.

Tr. at 589.

Also on August 23, 2019, the VA issued a decision increasing Plaintiff's impairment rating for PTSD from 70% to 100% disabling, effective August 15, 2019. Tr. at 515–16. The increase was based on unprovoked irritability with periods of violence; persistent danger of hurting others; persistent danger of hurting self; depressed mood; near-continuous depression affecting the ability to function independently, appropriately, and effectively; disturbances of motivation and mood; impaired impulse control; chronic sleep impairment; near-continuous panic affecting the ability to function independently, appropriately and effectively; total occupational and social impairment; difficulty in adapting to stressful circumstances; difficulty in adapting to work; difficulty in adapting to work-like setting; and anxiety. Tr. at 516.

On September 27, 2019, Dr. Southworth placed an administrative note in Plaintiff's VA medical record as to a conversation with Eric M. Chavez,

M.D. ("Dr. Chavez"), about a short-term disability claim with Standard Insurance. Tr. at 365–66. Dr. Southworth indicated he had explained: "I did not initiate any recommendation for disability, but . . . I supported it. I characterized the situation as one of 'burnout' from a very stressful job, that I had understood veteran to be carrying out competently enough." Tr. at 366. He denied regarding Plaintiff as impaired and indicated "it was best described as burnout, and that veteran was very stressed and sleep deprived." *Id.*

On September 30, 2019, Dr. Chavez, a board-certified psychologist, prepared a peer review report for Standard Insurance. Tr. at 494–502. He reviewed Plaintiff's medical records and statements from the period from May 28 through September 10, 2018. Tr. at 496–500. He summarized the evidence as follows:

> The claimant has a historical diagnosis of PTSD from military related combat. Up until September 2018, he was serving as a police officer with no issues. He is pursuing retirement from the police officer position related to his psychiatric diagnosis. Recent psychiatric progress notes reported some mood irritability related to his divorce but otherwise normal mental status examination findings and no severe symptoms. The claimant has engaged in outpatient therapy for anxiety and stress management. There is no evidence to support psychiatric symptoms of quality or severity such that they would impair function or require work limitations or restrictions. Specifically, there is no evidence of a major depressive episode, psychosis, cognitive impairment, risk of self-harm, or need for an elevated level of care such as psychiatric intensive outpatient program or hospitalization.

Tr. at 500. Dr. Chavez indicated the medical evidence supported the diagnosis of PTSD, but did not support diagnoses of ADHD, developmental reading disorder, and bulimia nervosa, as alleged. Tr. at 501. He felt that the medical documentation "support[ed] that the claimant would be able to perform under stress when confronted with emergency, critical, unusual, or dangerous situations, or situations in which speed and sustained attention are make or break aspects of the job." *Id.* He stated there was no written documentation to support Plaintiff's and his attending therapist's reports that his symptoms of PTSD were causing functional impairment. *Id.* He concluded the evidence did not "support verified psychological or cognitive limitations" and there was "no evidence to support an inability to perform his usual occupation." *Id.*

Also on September 30, 2019, Jeffrey B. Danzig, M.D. ("Dr. Danzig"), a board-certified internal medicine practitioner with a sub-specialty certificate in gastroenterology, prepared a peer review report. Tr. at 508–11. He reviewed several questionnaires and medical records from March 3 through June 4, 2019, summarizing the evidence as follows:

> The claimant is a 33 year old male with a history of PTSD. He has a long history of recurrent nausea and vomiting. Vomiting is described as a small amount of bilious emesis. EGD showed small gastric ulcer, but subsequent EGD was normal. Gastric emptying study was normal. The Gastroenterologist felt that his symptoms are psychogenic.

Tr. at 510. Dr. Danzig noted the primary diagnoses were nausea and vomiting, but felt the symptoms might be more consistent with regurgitation. *Id.* He concluded the severity of Plaintiff's stated functional limitations did not match the pathology documented in the record. *Id.* He determined Plaintiff had no work-related limitations from a gastrointestinal ("GI") perspective. *Id.* He indicated he agreed with Dr. Cornnell's assessment that Plaintiff had no significant GI pathology and that his symptoms were psychogenic. *Id.*

On March 25, 2020, Counselor Scanlon completed a mental health provider report for Plaintiff's long-term disability insurer. Tr. at 488–90. Dr. Scanlon's report is set forth in detail in the analysis section.

Plaintiff participated in a consultative mental status exam with Caleb Loring, IV, Ph.D. ("Dr. Loring"), through teleconference on July 7, 2020. Tr. at 459–61. He reported PTSD, panic attacks, bulimia nervosa, depression, and sleep problems. Tr. at 459. Dr. Loring observed Plaintiff to be pleasant and cooperative throughout the interview and mental status exam. *Id.* Plaintiff denied attending routine social activities and said he was a "hermit especially with COVID-19." *Id.* He reported seeing his children and girlfriend regularly. *Id.* He indicated he served two tours of duty in Iraq in 2007 and 2009 and left the Marine Corp in 2010. *Id.* He said he subsequently worked in law enforcement, where he was involved in a 2015 raid in which an

individual was shot. *Id.* He admitted he became frustrated and battered the suspect until his fellow officer stopped him. *Id.* He indicated he eventually stopped working because he was "somewhat out of control." Tr. at 460. He reported seeing a counselor, but denied taking medication. *Id.* He endorsed intrusive thoughts and depression that disturbed his sleep and vomiting associated with nervousness. *Id.*

Dr. Loring observed the following on mental status exam: good grooming and hygiene; good eye contact; unremarkable behavior; good speech and language skills; self-described depressed, anxious, and hypervigilant mood; normal affect; alert and oriented; good insight and judgment; goal-directed and linear thought process; no suicidal or homicidal ideation; and low-average to average intellectual functioning. *Id.* He noted Plaintiff was able to spell "world" correctly forward, but not backward. *Id.* He stated Plaintiff recalled three objects correctly immediately, but only one after a brief delay. *Id.* He endorsed anxious thought content and intrusive thoughts. *Id.* He described activities that included driving, performing indoor and outdoor chores, shopping, managing his money, preparing meals, caring for his children's needs, and engaging in personal hygiene and grooming. *Id.* Dr. Loring stated "Mr. G[] presents as an individual capable of engaging in all activities of daily living. He does not appear to be dealing with any psychiatric problems that would interfere with ability to engage in such

tasks." *Id.* He noted Plaintiff's "primary liabilities" at the time were "poor frustration tolerance and impulsivity." *Id.* He wrote:

> It seems as though he has some triggers that could lead to his behaving in unusual or unpredictable ways. If, however, he was employed in a vocational setting that was not particularly stressful or dealing with confrontations with people or violent situations he may very well be able to complete simple and complex tasks at an adequate pace with persistence.

*Id.* However, he admitted his opinion was limited by a lack of access to Plaintiff's medical records to "clarify his ability to engage in such tasks." *Id.* He noted Plaintiff's mental status was "very intact aside from perhaps some mild concentration and memory issues." *Id.* He considered Plaintiff capable of managing funds in his own best interest. *Id.* He diagnosed chronic PTSD and bulimia nervosa, both by history. Tr. at 461.

On July 20, 2020, state agency psychological consultant Blythe Farish-Ferrer, Ph.D. ("Dr. Farish-Ferrer"), reviewed the record, completed a psychiatric review technique ("PRT"), considered listings 12.13 for eating disorders, and 12.15 for trauma and stressor-related disorders, and assessed the following: mild limitation in ability to understand, remember or apply information; moderate limitation in ability to interact with others; moderate limitation in ability to concentrate, persist, or maintain pace; and mild limitation in ability to adapt or manage oneself. Tr. at 49–51. She completed a mental residual functional capacity ("RFC") assessment, noting moderate limitation as to the following abilities: to carry out detailed instructions; to

maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to work in coordination with or in proximity to others without being distracted by them; to interact appropriately with the general public; and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Tr. at 52–53.

On August 31, 2020, a second state agency psychological consultant, Michael Neboschick, Ph.D. ("Dr. Neboschick"), reviewed the record, completed a PRT considering the same listings, assessed the same degree of limitation in each as Dr. Farish-Ferrer, and found the same moderate limitations in the mental RFC assessment. *Compare* Tr. at 49–53, *with* Tr. at 66–67 *and* 69–70.

Plaintiff presented for a routine primary care visit on October 24, 2020. Tr. at 796. He reported urinary frequency, urgency, and nocturia. Tr. at 799. Dr. De La Rosa Serrano recorded normal findings on physical exam. Tr. at 798–99. He noted borderline elevated creatinine and instructed Plaintiff to discontinue use of over-the-counter pre-workout supplements. Tr. at 799. He ordered a prostate-specific antigen ("PSA") test to screen for prostate cancer. *Id.*

Dr. Cornnell completed an attending physician's statement for State of South Carolina long-term disability benefits. Tr. at 764–65. He identified

Plaintiff's primary diagnosis as healed gastric ulcer and his secondary diagnoses as chronic nausea and vomiting. Tr. at 764. He noted diagnostic studies had included a normal gastric emptying study and a normal upper endoscopy. *Id.* He indicated Plaintiff had experienced chronic nausea and vomiting for over 15 years. *Id.* He stated he had recommended Plaintiff continue to use a protein pump inhibitor for mucosal healing and follow up with psychiatry for PTSD, but denied having recommended Plaintiff stop work. *Id.* He considered Plaintiff capable of frequently lifting a maximum of 50 pounds, walking and standing for seven hours in an eight-hour workday, and sitting for seven hours in an eight-hour workday. Tr. at 765. He noted Plaintiff could frequently bend/stoop, grasp, and reach. *Id.* He noted Plaintiff was "CLEARED FROM GI STANDPOINT [as] ULCER HAS HEALED." *Id.*

Dr. Cornnell also completed an FMLA certification. Tr. at 766–69. He noted Plaintiff's acute gastritis had commenced in March 2019, but resolved. Tr. at 767. He indicated Plaintiff continued to have PTSD and chronic nausea and vomiting that had lasted 15 years. *Id.* He stated he had recommended Plaintiff follow up with a psychiatrist. *Id.* He did not consider Plaintiff unable to work due to GI problems. Tr. at 767–68.

C.    The Administrative Proceedings

    1.    The Administrative Hearing

        a.    Plaintiff's Testimony

At the hearing, Plaintiff testified he was 6' tall, weighed 210 pounds, had a valid driver's license, and was able to drive. Tr. at 34. He denied having worked since September 23, 2018. *Id.* He stated he had stopped working due to an escalation of PTSD symptoms following a shooting incident in 2015. Tr. at 35. He indicated his work had declined and Dr. Southworth had recommended he take time off. *Id.*

Plaintiff stated he experienced stress-induced vomiting as a physical symptom of his impairment. Tr. at 36. He indicated it occurred almost daily. Tr. at 40. He said it was typically triggered by stressful events, but sometimes occurred when he recalled previous thoughts. *Id.* He described a sinking feeling in his gut and a cold sweat. *Id.* He said it would last for one to five minutes and he sometimes experienced dry heaving. Tr. at 41. He explained that he had been diagnosed with bulimia in 2012, but agreed with the ALJ's assessment that the vomiting was generally a panic reaction. *Id.*

Plaintiff testified he also experienced severe anxiety, panic attacks, and sleep deprivation. Tr. at 37. He said he continued to experience panic attacks triggered by daily stressors. *Id.* He indicated the frequency of the panic attacks varied, depending on his ability to sleep. *Id.*

24

Plaintiff denied being under current mental health treatment, noting he had not seen anyone since his mental health provider retired. Tr. at 37. He stated he continued to see his medical doctors. *Id.* He denied taking any medication for psychological problems, as he had tried multiple medications for PTSD since 2012 and experienced adverse effects. *Id.*

Plaintiff testified he had seen Counselor Scanlon once a week for a year. *Id.* He denied problems with memory. *Id.* He admitted he had gone to Walmart at times, but said he did not go out often. Tr. at 37–38. He stated he typically had items delivered to his home from Costco. Tr. at 37. He indicated he dealt with people better on an individual basis than in a crowd. Tr. at 38. He denied using social media. *Id.*

Plaintiff said he and his ex-wife shared custody of their children, ages 8 and 11. *Id.* He explained that his children stayed in his home every Saturday through Tuesday. *Id.* He indicated he watched his children as they participated in activities. *Id.*

Plaintiff admitted he could care for his personal needs. Tr. at 39. He said he was able to complete household tasks. *Id.* He indicated he spent most of the day inside and isolated from others, except that he tried to go for a walk outside on most days, spent time with his children, and talked with family. *Id.* He confirmed that he watched television. *Id.*

b.     Vocational Expert Testimony

Vocational Expert ("VE") Lisa Cary reviewed the record and testified at the hearing. Tr. at 41–43. The VE categorized Plaintiff's PRW as a police officer I, *Dictionary of Occupational Titles* ("*DOT*") No. 375.263-014, requiring medium exertion and a specific vocational preparation ("SVP") of 6. Tr. at 42. The ALJ described a hypothetical individual of Plaintiff's vocational profile who had no exertional limitations, could concentrate sufficiently in two-hour increments to perform simple and repetitive tasks, could have occasional and casual contact with the general public, could perform no work in a team setting, and could tolerate occasional changes in work setting and procedure. *Id.* The VE testified the hypothetical individual would be unable to perform Plaintiff's PRW. *Id.* The ALJ asked whether there were any other jobs in the national economy that the hypothetical person could perform. *Id.* The VE identified light jobs with an SVP of 2 as an office helper, *DOT* No. 239.567-010, a non-postal mail clerk, *DOT* No. 209.687-026, and a marker, *DOT* No. 209.587-034, with approximately 45,000, 45,000, and 67,000 positions in the national economy, respectively. *Id.*

The ALJ asked the VE to consider the individual would require extraordinary breaks during the day of unpredictable duration and frequency secondary to symptoms. *Id.* He asked if there would be jobs consistent with such a limitation. *Id.* The VE testified there would be no jobs and explained,

based on her education and experience, that employers would allow a worker to be off-task for "maybe ten percent of the day above and beyond normal work and breaks," but no more often. Tr. at 42–43.

The ALJ asked the VE if her testimony was consistent with the *DOT*. Tr. at 43. The VE responded that her testimony was consistent, but explained that portions of her testimony as to time off task, extraordinary breaks, occasional public contact, and no teamwork or tandem work were based on her experience and education. *Id.*

### 2. The ALJ's Findings

In his decision dated January 28, 2021, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.
2. The claimant has not engaged in substantial gainful activity since September 23, 2018, the alleged onset date (20 CFR 404.1571 et seq.).
3. The claimant has the following severe impairments: a post-traumatic stress disorder (PTSD) and a history of bulimia (20 CFR 404.1520(c)).
4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations. Specifically, the claimant can concentrate sufficiently in two-hour increments to perform simple, repetitive tasks with occasional and casual contact with the general public; no work in a team setting; and occasional changes in work setting and procedure.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565).
7.  The claimant was born on February 23, 1986 and was 32 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563).
8.  The claimant has at least a high school education (20 CFR 404.1564).
9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).
10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, and 404.1569(a)).
11. The claimant has not been under a disability, as defined in the Social Security Act, from September 23, 2018, through the date of this decision (20 CFR 404.1520(g)).

Tr. at 17–24.

II.    Discussion

Plaintiff alleges the Commissioner erred in assessing his RFC because he did not properly evaluate Dr. Scanlon's opinion.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly

apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4)

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

whether such impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating

---

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold

the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

On March 25, 2020, Counselor Scanlon completed a mental health provider report for a long-term disability claim. Tr. at 488–90. He identified himself as a former licensed professional counselor, who had surrendered his license in 2019 upon retirement due to advanced Parkinson's disease. Tr. at 489. He indicated Plaintiff visited him in his home, as needed. Tr. at 488. He stated Plaintiff's primary diagnosis was PTSD. *Id.* He described Plaintiff as typically appearing anxious and confused. *Id.* He noted Plaintiff had reported panic attacks, compulsive vomiting, flashbacks, and sleep disturbance. *Id.* He stated Plaintiff had a previous diagnosis based on the Diagnostic and

Statistical Manual of Mental Disorders ("DSM"). Tr. at 489. He rated Plaintiff as having marked impairment in adaptation to stress, as he would lose his temper, and in activities of daily living ("ADLs"), explaining he avoided tasks. *Id.* He assessed extreme impairment in social functioning, noting Plaintiff avoided gatherings, and in concentration, describing him as oriented times three with difficulties. *Id.* He stated Plaintiff experienced chronic vomiting at least four times a week. *Id.* He noted Plaintiff had fair motivation and was not likely to be malingering. *Id.* He indicated Plaintiff experienced anxiety, poor concentration, and could not manage stress. *Id.* He described his treatment as occurring on an as-needed basis beginning in August 2018 and most recently on March 25, 2020. *Id.* He noted a treatment plan for Plaintiff to remain stable and denied that a return to work was part of the current plan. *Id.* He stated he had recommended Plaintiff visit a VA psychiatrist for medication management. *Id.* He indicated Plaintiff had been compliant with treatment to the extent that he kept his appointments. Tr. at 490. He felt that Plaintiff was unable to return to work in any environment. *Id.*

Plaintiff argues the ALJ improperly assessed Dr. Scanlon's opinion, causing error in assessing his RFC. [ECF No. 7 at 8]. He maintains the ALJ provided only a boilerplate statement that Dr. Scanlon's opinion was unpersuasive because "the evidence as a whole does not suggest that the

claimant has extreme limitations in social functioning and concentration." *Id.*
at 9 (citing Tr. at 21–22). He contends the ALJ failed to explain how Dr.
Scanlon's opinion was inconsistent with the other evidence or unsupported by
his findings. *Id.* at 9–11. He further claims the ALJ did not evaluate the state
agency psychological consultants' opinions as to supportability and
consistency prior to finding them persuasive. *Id.* at 11–12. He maintains Dr.
Scanlon's treatment notes support his opinion and his opinion is consistent
with the other evidence of record. *Id.* at 12. He contends that if the ALJ had
properly evaluated Dr. Scalon's opinion, he would have concluded he was
unable to meet the demands of competitive, remunerative, unskilled work. *Id.*
at 15.

The Commissioner argues the ALJ complied with the applicable
regulations in finding Counselor Scanlon's opinion unpersuasive. [ECF No. 8
at 10]. She maintains the ALJ cited an absence of treatment notes supporting
Counselor Scanlon's opinion, unremarkable mental status exams, a range of
ADLs, and other inconsistent mental health evidence. *Id.* at 10–15. She
contends the ALJ explained why the evidence supported marked—as opposed
to extreme—limitations in social interaction and concentration, persistence,
or pace and included restrictions in the RFC assessment to accommodate the
limitations supported by the evidence. *Id.* at 11–14. She claims the ALJ
reasonably found Counselor Scanlon's opinion not persuasive, given it was

neither consistent with the overall record, nor well supported. *Id.* at 15. She maintains the ALJ engaged in a fair and balanced evaluation of the opinion evidence in assessing Plaintiff's RFC. *Id.* at 15–16.

A claimant's RFC represents "the most [he] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1). The RFC assessment should reflect the ALJ's scrutiny of all the relevant evidence, and he should address all the claimant's medically-determinable impairments. 20 C.F.R. § 404.1545(a)(1). The ALJ must include a narrative discussion citing "specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)" and explaining how all the relevant evidence supports each conclusion. SSR 96-8p, 1996 WL 374184, at *7. "The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.*

In cases involving mental impairments, the ALJ must undertake a special technique prior to assessing the claimant's RFC. This requires the ALJ to rate the degree of the claimant's functional limitation as none, mild, moderate, marked, or extreme based on "the extent to which [his] impairment(s) interfere with [his] ability to function independently, appropriately, effectively, and on a sustained basis" in the broad functional areas of understanding, remembering, or applying information; interacting

with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. 20 C.F.R. § 404.1520a(b)

Medical opinions are among the evidence an ALJ should consider in rating the claimant's degree of mental functional limitation in each area and in assessing his RFC. The applicable regulation provides the ALJ must consider how persuasive he found medical opinions from all providers based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the medical opinions. 20 C.F.R. § 404.1520c(b)(c). Relevant to the supportability evaluation, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinion . . . will be." 20 C.F.R. § 404.1520c(c)(1). In evaluating the consistency factor, "[t]he more consistent a medical opinion . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion . . . will be." 20 C.F.R. § 404.1520c(c)(2). Supportability and consistency are considered the most important factors in assessing the persuasiveness of an opinion. 20 C.F.R. § 404.1520c(a), (b)(2). The ALJ must explain how he considered the supportability and consistency factors in evaluating each medical opinion. 20 C.F.R. § 404.1520c(b)(2).

Consequently, failure to consider supportability or consistency may result in remand. *See Bonnett v. Kijakazi*, 859 F. App'x 19 (Mem.) (8th Cir. 2021) (concluding remand was required for further evaluation of physician's opinion where "the ALJ adequately evaluated the supportability" of the opinion, but "did not address" whether it "was consistent with the other evidence of record, as required by the applicable regulation"). Substantial evidence must support the ALJ's conclusions as to the supportability and consistency of a medical opinion. "Remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)).

In evaluating the claimant's degree of limitation in the mental functional areas, the ALJ assessed moderate limitation in interacting with others, noting Plaintiff testified as to problems in social interaction, but Dr. Loring described him as pleasant and cooperative during the July 2020 consultative exam. Tr. at 18. He assessed moderate limitation in concentrating, persisting, or maintaining pace, noting Plaintiff "did not testify to severe limitations regarding this area of functioning" and Dr. Loring described him "as having only mild concentration issues." *Id.*

The ALJ found Plaintiff had the RFC to "concentrate sufficiently in two-hour increments to perform simple, repetitive tasks with occasional and casual contact with the general public; no work in a team setting; and occasional changes in work setting and procedure." Tr. at 19.

The ALJ addressed Counselor Scanlon's opinion as follows:

> Dr. Scanlon, a retired psychiatrist with the VAMC, indicated in a questionnaire completed in March 2020 that the claimant had PTSD, which imposed marked impairment with respect to his activities of daily living and adaptation to stress as well as extreme impairment in social functioning and concentration. He also described the claimant as incapable of returning to work involving activities similar to that of his past work. (Exhibit 10F, page 2). I did not find the assessment particularly [persuasive][5] given that there are no supporting treatment notes to substantiate the opinion. In any event, the evidence as a whole does not suggest that the claimant has extreme limitations in social functioning and concentration as mental status exams in the record have been fairly unremarkable.

Tr. at 21–22.

The ALJ's opinion contains several errors that likely influenced his evaluation of Counselor Scanlon's opinion and his ultimate assessment of Plaintiff's RFC. First, the ALJ stated "although the claimant alleged an onset date of September 23, 2018, the record does not contain any information as to treatment for any condition prior to February 2019 when he was seen for complaints of chronic nausea and diagnosed with a cyclic vomiting syndrome,

---

[5] In what appears to be a scrivener's error, the ALJ omitted the word "persuasive" from his explanation as to how he considered Counselor Scanlon's opinion.

PTSD, and bulimia. (Exhibit 1F, pages 5–6)." Tr. at 20. He subsequently erroneously noted "the first mental health note from the Veterans Administration Medical Center (VAMC) is dated May 6, 2019." *Id.* As indicated in the summary above, the record reflects at least four mental health treatment visits prior to February 2019, including visits with Dr. Southworth in July, September, and November 2018 and Counselor Scanlon in September 2018. *See* Tr. at 492, 708–11, 715–18, 732–35. Plaintiff also saw Dr. Sallee on February 4, 2019, and Dr. Southworth on February 6, 2019, for mental health treatment. Tr. at 677, 692–99.

This error afflicted the ALJ's consideration of the supportability of Counselor Scanlon's opinion, as he erroneously concluded there were "no supporting treatment notes to substantiate the opinion." Tr. at 20. The Commissioner urges the court to interpret this statement to suggest the ALJ evaluated Counselor Scanlon's treatment notes and concluded they failed to support his conclusions. However, given the ALJ's errors in assessing the evidence in general, the undersigned can draw no such conclusion. The record lacks documentation to support the weekly treatment with Counselor Scanlon Plaintiff reported to Drs. Southworth and Sallee and testified to during the hearing. *See* Tr. at 37, 440, 795. However, it contains Counselor Scanlon's September 2018 intake assessment and brief treatment notes for nine visits between May 7 and July 17, 2019. Tr. at 584–86. The ALJ's

decision contains no reference to this evidence, leading the undersigned to conclude he failed to evaluate it in reaching his conclusion as to the supportability factor. This conclusion is reinforced by the ALJ's mischaracterization of Counselor Scanlon as "Dr. Scanlon, a retired psychiatrist with the VAMC." Tr. at 21. In fact, the record shows Counselor Scanlon was a counselor outside the VAMC, who was licensed when Plaintiff began treatment with him in September 2018, surrendered his license in 2019 due to Parkinson's disease, and continued to counsel Plaintiff in his home, as needed. Tr. at 489, 492. Because the ALJ's evaluation of the supportability factor reflects a failure to review all the relevant records, it is not supported by substantial evidence.

The ALJ's erroneous representation of evidence as to mental health treatment also plagued his consideration of the consistency between Dr. Scanlon's opinion and the other evidence of record. He appears to have considered no medical records other than Dr. Loring's consultative exam in rating the degree of Plaintiff's limitations in the four areas of mental functioning. *See* Tr. at 18. Despite the evidence summarized above, the only references to Plaintiff's mental health treatment in the ALJ's decision pertain to the May 6, 2019 note from Plaintiff's treatment with Dr. Sallee and the consultative exam with Dr. Loring. *See* Tr. at 18, 20. The ALJ did not address Plaintiff's treatment with Dr. Southworth or the earlier visit with Dr. Sallee.

He "agree[d]" with Dr. Simons's opinion that Plaintiff was "not suited for police work," Tr. at 21, but he did not address any of Dr. Simons's observations in the decision. "An ALJ has the obligation to consider all relevant evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." *Lewis*, 858 F.3d at 869 (quoting *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). The ALJ did not meet his obligation to consider all the evidence in the record, leading to an inadequately-supported conclusion that Counselor Scanlon's opinion was inconsistent with the other evidence of record.

Although the ALJ was not required to address the VA's disability decision directly, he was required to evaluate the underlying medical opinion forming the basis of the VA's decision in accordance with 20 C.F.R. § 404.1520c. *See Charles F. v. Commissioner of Social Security*, C/A No. 19-1664-LJV, 2021 WL 9633585 (W.D.N.Y. Mar. 15, 2021) (finding the ALJ erred in declining to address medical opinions rendered after two C&P exams that explained how the claimant's impairments affected his ability to work and were included in disability determinations from the VA); *Joseph M. R. v. Commissioner of Social Security*, C/A No. 3:18-1779-B90R, 2019 WL 4279027 (D. Or. Sept. 10, 2019) (concluding the ALJ erred when "he failed to consider" and "provide legally sufficient reasons supported by substantial evidence" for rejecting an opinion from the physician who examined the plaintiff at the

request of the VA in connection with his VA disability claim). The ALJ did not address Dr. Paris's opinion rendered pursuant to the C&P exam that Plaintiff had "[t]otal occupational and social impairment" due to PTSD. Tr. at 343. The ALJ's failure to address Dr. Paris's opinion was particularly troubling given consistency between his and Counselor Scanlon's opinions. Because the ALJ's evaluation of the consistency factor was not based on the entire record, it is not supported by substantial evidence.

The ALJ also failed to comply with the requirements of 20 C.F.R. § 404.1520c in evaluating the other opinions of record. Although he found persuasive Dr. Simons's opinion that Plaintiff was not suited for police work, he did not discuss how the supportability and consistency factors led to his conclusion. *See* Tr. at 20. He "agree[d] with Dr. Cornnell's opinion that Plaintiff was not disabled from a GI perspective, but again failed to address the supportability and consistency factors. *See id.* He failed to discuss the supportability and consistency factors when he "did not find . . . persuasive" Dr. Chavez's opinion. *Id.* He found Dr. Danzig's opinion that Plaintiff "had no functional impairments from a gastrointestinal perspective" to be persuasive, but neglected to address the supportability and consistency factors. *Id.* He considered Dr. Loring's opinion that Plaintiff could perform simple and complex tasks in a low stress environment "generally persuasive," without explaining how the supportability and consistency factors reinforced his

42

finding. Tr. at 21. Finally, he found the state agency psychological consultants' opinions "persuasive in finding the claimant can concentrate sufficiently in two-hour increments to perform simple, repetitive tasks with occasionally and casual contact with the general public; no work in a team setting; and occasional changes in work setting and procedures as such conclusions are well-supported by the other medical evidence of record." *Id.* The ALJ did not explain how the conclusions were "well-supported" by the other evidence. *See id.*

The ALJ neglected to provide a logical explanation to support the restrictions he included in the RFC assessment. In *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019), the court clarified that "a proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion." Here, the ALJ provided as follows:

> In summary, I considered the claimant's combination of severe mental impairments in concluding him capable of <u>concentrating sufficiently in two-hour increments to perform simple, repetitive tasks with occasional and casual contact with the general public; no work in a team setting; and occasional changes in work setting and procedure as such conclusions are well-supported by the other medical evidence of record.</u>

Tr. at 22 (emphasis in original). Nowhere in this paragraph or any paragraph discussing the RFC assessment did the ALJ explain how these restrictions addressed Plaintiff's functional limitations. *See generally* Tr. at 19–22. The

ALJ failed to comply with his obligation to provide a narrative discussion pursuant to SSR 96-8p.

Because the ALJ failed to apply the proper legal standards, substantial evidence does not support his evaluation of Counselor Scanlon's opinion or his assessment of Plaintiff's RFC.

## III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

November 29, 2021                                    Shiva V. Hodges
Columbia, South Carolina                            United States Magistrate Judge